**JOHN GIL CONSTRUCTION, INC., Plaintiff,**

v.

**Milo RIVERSO, an individual, the New York City School Construction Authority, New York City Off–Track Betting Corporation, the Department of Investigation for the City of New York and John Does 1–10, Defendants.**

No. 99 Civ. 6112 SAS.

United States District Court, S.D. New York.

Sept. 23, 1999.

J. Garth Foley, New York, NY, for plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, Elaine Windholz, Assistant Corporation Counsel of the City of New York, New York, NY, Soraya Berg, New York City School Construction Authority, Office of the General Counsel, Long Island City, NY, for defendant SCA.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff John Gil Construction, Inc. ("JGC") seeks a temporary restraining order and a preliminary injunction compelling The New York City School Construction Authority (the "SCA", the "authority" or "defendant") to revoke (1) its suspension of plaintiff's prequalified bidder status; (2) its suspension of plaintiff's right to work on SCA projects; and (3) its award to others of two contracts upon which plaintiff was the lowest bidder. For the reasons set forth below, plaintiff's request for preliminary injunctive relief is denied.

## I. Background [1]

### A. SCA

In 1988, the New York state legislature created the SCA, a public benefit corpora-

---

1. During a conference with the Court, both parties agreed that there were no disputed issues of fact warranting an evidentiary hear-
ing. *See* Transcript of August 31, 1999 Hearing ("8/31/99 Tr.") at 3–4. Therefore, the following facts are drawn from pleadings,

tion, in response to the "deplorable physical condition" of New York city's elementary and secondary schools. *See* N.Y. Pub. Auth. Law § 1725 (historical and statutory notes) (McKinney 1999) [hereinafter "PAL § ___"]. The SCA has broad powers to oversee "the acquisition, design, construction and major rehabilitation of New York city schools" and is "exempt from local laws and regulations concerning the provision of school buildings." *Id.*

Pursuant to PAL § 1734, the SCA has authority to prescreen and prequalify contractors who desire to bid for school construction contracts. Section 1734 provides:

> [T]he authority shall establish guidelines governing the qualifications of bidders entering into contracts for the construction ... [of] educational facilities for the city board. The bidding may be restricted to those who have qualified prior to the receipt of bids according to standards fixed by the authority. . . .
>
> ... In determining whether a prospective bidder qualifies for inclusion on a list of pre-qualified bidders, the authority shall consider (1) the experience and past performance of the prospective bidder; (2) the prospective bidder's ability to undertake work; and (3) the financial capability, responsibility and reliability of prospective bidders. The authority may also consider such other factors as it deems appropriate.

PAL § 1734(3)(a)-(b). The SCA is mandated to review and update its list of prequalified bidders "not less than annually." PAL § 1734(3)(c).

In accordance with the above-quoted statutory grant, the SCA promulgated guidelines governing the prequalification process for school contractors. *See* Guidelines for Qualification and Evaluation of Contractors, Subcontractors, Consultants, Vendors and Suppliers for Contracts on All Phases of Construction, Reconstruction, Improvement or Rehabilitation of New York City Schools ("Guidelines"), N.Y. Comp.Codes R. & Regs. tit. 21, § 9600.1 et seq. [hereinafter "21 NYCCRR § ___"]. Under the Guidelines, applicants for prequalification must meet a series of minimum standards with respect to financial capacity, experience and work history. 21 NYCCRR § 9600.3. The Guidelines also require companies to demonstrate "integrity and ethics" in their business practices: "Companies seeking to do business with the authority must have a reputation for and a record of law-abiding conduct and ethical business practices. Failure to meet this standard will result in the applicant's disqualification for a period of up to five years." 21 NYCCRR § 9600.3(d).[2] Accordingly, the Guidelines provide that "[t]he applicant, its affiliates, or any of its current or past owners or principals ·may be precluded from working for the authority until there is a favorable resolution of ... a pending criminal investigation." 21 NYCCRR § 9600.3(d)(2).

The Guidelines set forth procedures the SCA must follow in determining whether to deny or revoke a contractor's prequalified status:

> (a) In the event the authority concludes that there may be sufficient evidence to warrant denial/revocation of a firm's prequalification, the authority shall notify the contractor of its proposed denial or revocation of prequalification status, the reasons for this denial/revocation, and the period of disqualification.
>
> (b) a contractor so notified may request a meeting, at which the contractor shall have the opportunity to present evidence that might result in reconsideration of the authority's preliminary conclusion to

---

briefs and supporting materials submitted by the parties in connection with plaintiff's motion for preliminary injunctive relief.

2. The SCA may revoke a contractor's prequalified status "on the basis of either changed circumstances or discovery of new evidence that indicates the firm does not meet the authority's standards." 21 NYCCRR § 9600.4.

deny or revoke the contractor's prequalification.

(c) The authority shall provide to the contractor final written notification of its determination.

21 NYCCRR § 9600.5. The SCA's determination to revoke a contractor's prequalification status is a final decision, and the Guidelines do not include any process for appeal of that decision within the SCA.

### B. JGC

Plaintiff JGC is a New York construction company that derives 100% of its revenue from government building contracts. *See* Memorandum of Law in Support of Plaintiff's Request for a Temporary Restraining Order, and Preliminary Injunction ("Pl.Mem.") at 3; 7/30/99 Affidavit of J. Garth Foley (plaintiff's attorney) in Support of Plaintiff's Motion for Injunctive Relief ¶ 5. In 1995, JGC applied and was selected to be an SCA prequalified bidder. Complaint ¶ 59.[3] In June 1996, JGC won a contract from another city agency, the New York City Off–Track Betting Corporation ("OTB"). *Id.* ¶ 19. Two years later, in September 1998, OTB and JGC became involved in a billing dispute over payment for services rendered. *Id.* ¶¶ 55–56. In October 1998, OTB notified JGC that JGC was being investigated by the New York City Department of Investigation ("DOI").[4] *Id.* ¶ 57. Although JGC claims that it has never received any information from OTB or DOI regarding the substance of the allegations against it, *see*

*id.* ¶¶ 1, 70, those allegations apparently involve billing irregularities stemming from JGC's 1996 contract with OTB.[5] *See* 3/30/99 letter from Kenneth D. Litwack, plaintiff's attorney, to SCA, Ex. 12 to 7/30/99 Affidavit of John Gil ("Gil Aff.").[6]

In a letter dated February 2, 1999, the SCA gave JGC notice that because the company was under criminal investigation by OTB and DOI, the SCA could, pursuant to its rules, suspend JGC from working for the SCA until there was a favorable disposition of the investigation. *See* Complaint ¶¶ 66–67; 2/2/99 letter from SCA to John Gil, Ex. 10 to Gil Aff. The letter offered JGC an opportunity to meet with SCA officials to dispute that it was under investigation by OTB or "to bring possibly mitigating circumstances" to the SCA's attention. 2/2/99 letter, Ex. 10 to Gil Aff. JGC met with SCA authorities on March 5, 1999. Complaint ¶ 68. During the meeting, JGC asked the SCA to postpone its decision regarding JGC's prequalified status, so that JGC could meet with OTB officials. *Id.* ¶¶ 68–70. Plaintiff also requested that SCA conduct a "hearing". *Id.* It appears that the SCA agreed to postpone its decision regarding JGC for two weeks. *See* 3/29/99 letter from SCA to Litwack, Ex. 11 to Gil Aff. By March 29, more than three weeks after the March 5 meeting between the SCA and JGC, the SCA had not received any additional information or communications from JGC. *Id.* Accordingly, on that date, SCA wrote to

**3.** Plaintiff filed an Amended Complaint on August 23, 1999, and a Second Amended Complaint on September 3, 1999. However, since plaintiff's motion for preliminary relief and defendant's opposition to that motion are based on the original complaint filed August 2, 1999, I refer to the original complaint ("Complaint") for purposes of resolving the motion.

**4.** Although OTB and DOI have been named as defendants in this action, they were not properly served until plaintiff served its Second Amended Complaint on September 3. *See* 8/31/99 Tr. at 6–7. As a result, OTB and DOI have not appeared in the case, and they did not submit briefs in opposition to plaintiff's

motion for preliminary injunctive relief. However, in its motion for preliminary injunctive relief, JGC seeks only to compel action by SCA; it does not seek to compel action—or inaction—by OTB or DOI.

**5.** Moreover, the OTB/DOI investigation of JGC is a "criminal investigation." *See* 8/12/99 Affidavit of Susan Ross, Deputy Assistant Commissioner of DOI, in Support of The SCA's Opposition to Plaintiff's Application for a Temporary Restraining Order at ¶¶ 2–3 and Ex. A.

**6.** John Gil is the founder and President of JGC.

JGC asking whether the company had gathered additional information regarding the OTB investigation that it wished to present. *Id.* SCA informed JGC that if it did not receive additional materials by March 30 it would "proceed to make a determination based upon the facts we have in hand." *Id.* In a response letter to the SCA, JGC's attorney stated that although JGC had met with OTB and DOI, the agencies "refused to present [JGC] with the allegations against [it]." 3/30/99 letter from Litwack to SCA, Ex. 12 to Gil Aff. However, JGC's attorney offered to proceed before the SCA with a "Name Clearing hearing" during which JGC would "present evidence that it earned every penny it billed for at OTB and that there was no wrongdoing." *Id.* A "Name Clearing hearing" was never held.

On June 1, the SCA sent JGC a letter suspending the company from working for the SCA and removing the company from the list of prequalified SCA bidders. *See* 6/1/99 letter from SCA to John Gil, Ex. 14 to Gil Aff. On June 3, according to the Complaint, the SCA informed JGC that JGC would not be awarded three contracts on which JGC alleges it was the apparent lowest bidder. *See* Complaint ¶¶ 76–77. On June 4, JGC submitted a letter to the SCA asking the authority to reconsider JGC's suspension. *See* 6/4/99 letter from

John Gil to Milo Riverso, President and CEO of SCA, Ex. 15 to Gil Aff. In a letter dated June 9, the SCA stated that its decision revoking JGC's prequalified status was final. *See* 6/9/99 letter from SCA to John Gil, Ex. 16 to Gil Aff.

In July 1999, the SCA awarded two of the three contracts upon which JGC claims it was the lowest bidder to other companies. *See* 7/12/99 Notice to Proceed on Contract C000007955 and 7/20/99 Notice to Proceed on Contract C000007981, Ex. A to 8/13/99 Declaration of Soraya Berg, Attorney for Defendant SCA, in Opposition to Plaintiff's Application for a Temporary Restraining Order ("Berg Aff."). The two contracts are worth approximately $1,166,-000. *See id.* The third contract, solicitation No. 2307–1, has been canceled. *See* Berg Aff. ¶ 3.[7]

On August 2, JGC brought action against the SCA, OTB and DOI.[8] JGC's primary allegation is that by suspending JGC's status as a prequalified bidder, the SCA deprived JGC of property and liberty interests in violation of the Due Process Clauses of the United States Constitution and the New York State Constitution.[9] JGC also alleges that the SCA's actions constitute a violation of the Equal Protection Clause.[10] Together with its Com-

---

7. The SCA also claims that JGC never submitted any bid for the third contract, let alone the lowest bid. *See* List of Bidders for Solicitation No. 99–002307–1, Ex. B to Berg. Aff. However, whether JGC submitted the lowest bid—or any bid—for the third contract is immaterial because that contract has been canceled.

8. The Complaint also names Milo Riverso (SCA's President and CEO) and John Does 1–10 as defendants. However, that Complaint makes no allegations against any of those defendants. *See* Complaint ¶¶ 88–199.

9. Although plaintiff cites to §§ 1 and 7 of the New York State Constitution, I presume plaintiff intends to cite § 6 which is the state Due Process Clause. *See* N.Y. Const. art. I, § 6.

10. Although the Complaint purports to set forth seven "causes of action," it fails to al-

lege seven distinct claims. *See* Complaint ¶¶ 88–199. Thus, for purposes of resolving this motion, I will construe plaintiff's Complaint as setting forth two claims: violations of (i) due process and (ii) equal protection. Moreover, in its Complaint, plaintiff brings contract claims against OTB and DOI. However, as set forth above, OTB and DOI have not yet appeared in this action. Nor does plaintiff seek injunctive relief with respect to OTB or DOI. Accordingly, I shall not address the merits of JGC's contract claims against OTB and DOI. Similarly, although the Complaint asserts a Title VII violation, it fails to set forth a single factual or legal allegation that would support such a claim. In addition, plaintiff makes no mention of a Title VII claim in its motion for preliminary injunctive relief. *See* Pl. Mem. Therefore, I will not address the merits of JGC's Title VII claim.

plaint, JGC filed the instant motion for a temporary restraining order and a preliminary injunction seeking to compel SCA to reverse its suspensions of JGC and its award to others of the two contracts upon which plaintiff alleges it was the lowest bidder.[11]

## II. Applicable Legal Standard

■ A party seeking preliminary injunctive relief generally must show (i) irreparable harm absent the requested injunctive relief, and (ii) either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships favoring the movant. *See Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994). In the instant case, however, plaintiff must meet a higher standard.

■ *First*, because plaintiff's requested injunction will affect government action taken in the public interest pursuant to a statutory and/or regulatory scheme, plaintiff "must satisfy the more rigorous likelihood of success prong" rather than the serious questions prong. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir.1996) (internal quotations omitted); *see also Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir.1999). In addition, when a "request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Rodriguez*, 175 F.3d at 233 (internal quotations omitted).

■ *Second*, plaintiff seeks to alter rather than maintain the status quo by compelling the SCA to revoke its suspensions of JGC and its award of the two contracts. A preliminary injunction that "alter[s] the status quo by commanding a positive act" is known as a "mandatory injunction." *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995). A mandatory injunction requires that the movant show not just likelihood of success but a "clear" or "substantial" likelihood of success on the merits. *See Rodriguez*, 175 F.3d at 233; *see also Tom Doherty*, 60 F.3d at 34 ("The 'clear' or 'substantial' showing requirement—the variation in language does not reflect a variation in meaning—thus alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success.").

## III. Discussion

### A. Irreparable Harm

JGC alleges that it will be irreparably harmed absent interim relief because, as a result of the SCA's suspension, JGC "has no new projects to pursue, and is unable to bid contracts at other agency's[sic] as the suspension effectively foreclose[s] plaintiff from [working with] any other government entities, city, state or federal." Pl. Mem. at 3. In contrast, the SCA asserts that there is no irreparable harm because JGC "is precluded from doing work only with the SCA." Defendant The SCA's Memorandum of Law in Opposition to Plaintiff's Application For a Temporary Restraining Order ("Def.Mem.") at 4.

■ In order to demonstrate irreparable harm, the moving party must show that the alleged harm is "imminent, not remote or speculative." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990). Moreover, "the alleged injury must be one incapable of being fully remedied by monetary damages." *Id.*

If, as defendant contends, JGC were precluded only from contracting with the SCA, then there would be no irreparable harm because plaintiff would be free to

---

11. In its motion, plaintiff seeks preliminary injunctive relief with respect to three contracts upon which plaintiff alleges it was the lowest bidder. However, as set forth above, the SCA has canceled the third contract. Thus, I consider plaintiff's request for interim relief only with respect to the two viable contracts.

contract with any other public entity. Plaintiff contends that 100% of its revenue is derived from government contracts; it makes no claim that 100% of its revenue is derived from SCA contracts. Moreover, any damages resulting from the loss of the two SCA contracts upon which JGC alleges it was the lowest bidder is readily determined and can be fully compensated through money damages should JGC ultimately prevail on the merits of its lawsuit. However, the SCA's suspension of JGC is likely to have much broader effect.

The Vendor Information Exchange System (VENDEX) is a publicly accessible database of all vendors who wish to do business with the City of New York. *See* VENDEX Business Entity Questionnaire, Ex. C to Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's Order to Show Cause Seeking Injunctive Relief ("Pl. Reply Mem."), at 1. Under the City Charter, "any finding of nonresponsibility by an agency must be reported to the VENDEX" and agencies "must check the VENDEX for adverse entries regarding bidders before awarding a contract." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 878 (2d Cir.1996). Similarly, contractors wishing to bid on city contracts must complete the VENDEX Business Entity Questionnaires that accompany all city contracts worth more than $50,000. *See* Pl. Reply Mem. at 5 and Ex. C.

Plaintiff argues that because information regarding its suspension by the SCA must be reported to VENDEX, all other New York City agencies will refuse to contract with JGC, effectively precluding the company from working for the City of New York. Pl. Mem. at 3–4; Pl. Reply Mem. at 5. Plaintiff also contends that it will be precluded from working for New York State and federal agencies with access to the VENDEX system. *Id.* In support of its argument, plaintiff cites a 1993 study of the VENDEX system which found that agencies rely on other agencies' determinations of nonresponsibility as reported on VENDEX "to justify their continuing exclusion of these vendors from the City's contracting process—in effect, a 'de facto' debarment." *See* 11/12/93 Procurement Policy Board Staff Report, City of New York, An Assessment of New York City's Vendor Responsibility Determination Process, Ex. 22 to Pl. Mem., at 21. The study also concluded that many agencies rely exclusively on the VENDEX system for determinations of business integrity and that "[t]o be found non-responsible in New York City today, is to bear a stigma of 'corruption.'" *Id.* at 18–19.

In opposition to plaintiff's claims regarding harms stemming from the reporting requirements of the VENDEX system, defendant asserts only that "[t]he SCA has not transmitted the information to the City's vendex[sic] system." Def. Mem. at 4. The SCA's response entirely overlooks the requirement that contractors themselves must reveal to VENDEX that they have been suspended or debarred by an agency and why. *See* VENDEX Business Entity Questionnaire, Ex. C to Pl. Reply Mem., at 6. Thus, regardless of whether the SCA reports JGC's suspension to VENDEX, JGC must itself transmit such information to the database if it chooses to bid for New York City contracts.[12] *See id.* In addition, defendant does not dispute that if information regarding JGC's suspension were, in fact, transmitted to the VENDEX system, other public entities would avoid contracting with JGC and JGC would be harmed. Again, the SCA asserts only that it has not transmitted such information.

---

12. In addition, it is notably unclear whether the SCA "has not transmitted" information regarding JGC to VENDEX but intends to do so in the future, or if the SCA is for some reason exempt from reporting findings of nonresponsibility to VENDEX. Put another way, it is curious that the SCA claims only that it "has not" transmitted information to VENDEX rather than "it will not transmit" or "it is not required to transmit" information to the database.

■ Due to the reporting requirements of the VENDEX system, I find it likely that other public entities will learn of JGC's suspension and that, as a result, those agencies will not contract with JGC. In light of JGC's unrebutted claim that 100% of its revenue is derived from government contracts, there is an almost certain likelihood that it will suffer irreparable losses from its inability to contract with the SCA and other city, state and federal agencies. Moreover, such losses are not fully compensable through money damages because it would be impossible to determine which contracts JGC would have been awarded absent the suspension. Accordingly, I find that plaintiff has demonstrated irreparable harm.

## B. Likelihood of Success on the Merits

■ As set forth above, plaintiff's substantive allegations against the SCA can be divided into two groups: Due Process and Equal Protection.[13]

### 1. Procedural Due Process

■ Pursuant to the Due Process Clause of the Fourteenth Amendment, the states may not deprive an individual of property or liberty without due process of law. In order to prevail on a due process claim, a plaintiff must identify a constitutionally protected property or liberty interest and demonstrate that the state has deprived it of that interest without due process of law. See Local 342 v. Town Bd. of Huntington, 31 F.3d 1191, 1194. (2d Cir.1994).[14]

### a. Property Interest

JGC contends that it has a constitutionally protected property interest in its status as an SCA prequalified bidder. See Complaint ¶ 89. The SCA allegedly violated that property interest when it suspended JGC's prequalified status and its right to work on SCA projects. See id. ¶ 92.

■ To have a protected property interest, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Property interests flow not from the Constitution itself, but from 'existing rules or understandings that stem from an

13. Although the Complaint is unclear, plaintiff appears to bring these claims pursuant to 42 U.S.C. § 1983. See Complaint ¶ 2. Section 1983 allows plaintiffs with constitutional and/or federal claims to sue in federal court without first exhausting administrative or state remedies. See Kraebel v. New York City Dep't of Hous. Preservation & Dev., 959 F.2d 395, 404 (2d Cir.1992). Accordingly, this Court has jurisdiction to hear plaintiff's due process and equal protection claims, despite the fact that plaintiff has not pursued state remedies such as an Article 78 proceeding.

The instant case is distinguishable from Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877 (2d Cir.1996), in which the Second Circuit found that the district court lacked subject matter jurisdiction to hear the plaintiff's due process claims—brought under § 1983—because the plaintiff failed to pursue those claims in an Article 78 proceeding. Hellenic involved a random and unauthorized act by state employees, and therefore any due process concerns were alleviated by the availability of a meaningful post-deprivation remedy, namely an Article 78 proceeding. See id. at 880–82. In contrast, the instant case does not involve a random and unauthorized act by state employees. Rather, as discussed infra Part III. B.1.c., SCA authorities followed statutory and administrative procedures when they suspended JGC. As a result, adequate post-deprivation remedies do not necessarily satisfy due process and therefore this Court retains subject matter jurisdiction to hear plaintiff's constitutional and federal claims. See id. at 880.

14. Plaintiff also alleges violations of the Due Process Clause of the New York State Constitution, N.Y. Const. art. I, § 6. Because the language of the federal and state Due Process Clauses is identical, and because neither plaintiff nor defendant contend that a different standard applies with respect to the state Due Process Clause, my analysis of the merits of plaintiff's federal due process claim applies with equal force to the merits of plaintiff's state due process claim.

independent source such as state law'". *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175 (2d Cir.1991) (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701). Where the state "statute, regulation, or contract in issue vests in the state significant discretion over the continued conferral of [a] benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit." *Id.; see also S & D Maintenance Co. v. Goldin*, 844 F.2d 962, 968 (2d Cir.1988) (finding that city's ability to terminate meter maintenance contract at will was "fatal" to plaintiff's asserted property interest in continuation of contract for its term).

Courts in the Second Circuit have routinely held that "'involvement in publicly-financed projects does not rise to the level of a property interest.'" *See Empire Transit Mix, Inc. v. Giuliani*, 37 F.Supp.2d 331, 335 (S.D.N.Y.1999) (quoting *Eastway Constr., Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985)); *see also S & D Maintenance*, 844 F.2d 962; *Shifa Servs., Inc. v. The Port Auth. of New York & New Jersey*, 96 Civ. 1361, 1997 WL 16062,*4 (S.D.N.Y. Jan. 15, 1997). In *Eastway*, the Second Circuit found that a general contracting firm had no protected property interest in its continued participation in public redevelopment projects: "Certainly, Eastway desired—and perhaps even needed or expected—to continue acting as a general contractor on public redevelopment projects. But it fails to point to a single constitutional, statutory or contractual provision that would entitle it to do so." 762 F.2d at 250. Similarly, in *S & D Maintenance*, the Second Circuit declined to "constitutionalize contractual interests that are not associated with any cognizable status of the claimant beyond its temporary role as a governmental contractor." 844 F.2d at 967; *see also Em-*

*pire Transit Mix*, 37 F.Supp.2d at 335–36 (finding concrete supplier had no property interest in its supply contracts with contractors on New York city projects).

JGC, like the contractors in *Eastway, S & D Maintenance* and *Empire Transit Mix*, has no property interest in contracting with the SCA or any other public entity. Nor does JGC have a property interest in its status as an SCA prequalified bidder. JGC is not "entitled" to its status as a prequalified bidder; that status is impermanent and can be revoked at the discretion of the SCA.

█ In support of its motion, plaintiff contends that the statutes and regulations giving rise to the SCA's prequalification process "do not allow for discretionary determinations by SCA officials, and [thus establish] a property interest pursuant to state law." Pl. Mem. at 12. Plaintiff is wrong. As set forth above, *see supra* Part I.A., PAL § 1734 allows the SCA significant discretion to establish prequalification procedures. For example, "[i]n determining whether a prospective bidder qualifies for inclusion on a list of pre-qualified bidders . . . . [t]he authority may also consider *such other factors as it deems appropriate.*" PAL § 1734(3)(b) (emphasis added). Moreover, the SCA must review and update its lists "not less than annually", *see* PAL § 1734(3)(c), which means that the SCA can review and, if necessary, change its lists of prequalified bidders on a weekly or even daily basis. Under the Guidelines, the SCA may revoke a contractor's prequalified status "on the basis of either changed circumstances or discovery of new evidence." 21 NYCCRR § 9600.4.[15] And, most important, the SCA has discretion to preclude a contractor from working for the authority "until there is a favorable resolu-

15. Plaintiff also has no property interest in the two contracts on which it alleges it was the lowest bidder. Pursuant to the SCA Guidelines, bids are awarded not to the lowest bidder but to the lowest "responsible" bidder. *See* PAL § 1734. Moreover, New York law explicitly states that "[n]either the low bidder nor any other bidder has a vested property interest in a public works contract." *Conduit & Foundation Corp. v. Metropolitan Transp., Auth.*, 66 N.Y.2d 144, 148–49, 495 N.Y.S.2d 340, 485 N.E.2d 1005 (1985).

tion of ... a pending criminal investigation." 21 NYCCRR § 9600.3(d)(2).

■ In light of the Second Circuit's refusal to recognize a property interest in publicly-financed projects and the SCA's significant discretion over its prequalification process, it is extremely unlikely that JGC can claim a constitutionally protected entitlement to its status as a prequalified bidder on SCA projects. Accordingly, I find that for purposes of its motion for preliminary injunctive relief, JGC has failed to demonstrate a clear likelihood that it has a property interest subject to protection under the Due Process Clause.

### b. Liberty Interest

JGC also contends that it has a liberty interest in its reputation as a public contractor and that, "[i]n the case at hand, [its] reputation has been severely damaged." *See* Pl. Mem. at 13.

■ Corporate entities such as government contractors have a protected liberty interest in their good name and reputation. If government actors damage that reputation by disseminating defamatory information without due process, the injured company may be entitled to relief. *See Kelly Kare*, 930 F.2d at 177. However, "[t]o prevail on such a liberty-interest claim, a plaintiff must establish that the information was stigmatizing, false, and publicized by the state actor." *Id.; see also S & D Maintenance*, 844 F.2d at 970; *Brandt v. Board of Educ. Servs.*, 820 F.2d 41, 43 (2d Cir.1987).

■ In the instant case, plaintiff is presumably alleging that its good name and reputation have been or will be damaged by the suspension of its SCA prequalified status and the inevitable publication of that suspension on the city's VENDEX system.[16] *See* Pl. Mem. at 13. As set forth in the preceding discussion of irreparable harm, *see supra* Part III.A., there is no question that suspension by a New York City agency—and publication of that suspension on VENDEX—is stigmatizing and damaging to a public contractor desiring to do business with other city, state and federal agencies. However, to adequately allege that such damage rises to the level of a constitutional deprivation of liberty, JGC must demonstrate not just that the suspension by the SCA harmed its reputation, but that the SCA publicized false information about the company. This plaintiff fails to do.

To begin, plaintiff makes no allegation that the SCA has "publicized" any information regarding JGC. The SCA asserts that it has not transmitted any information regarding JGC to VENDEX, *see* Def. Mem. at 4, and JGC does not dispute the SCA's claim, *see* Pl. Rep. Mem. at 5.[17] Assuming for the sake of argument, however, that the SCA eventually transmits information regarding JGC to VENDEX, there is no reason to believe—and plaintiff does not allege—that the substance of that transmission would consist of anything other than a statement that the SCA had suspended JGC from working on or bidding for SCA contracts pending the outcome of a criminal investigation. Indeed, in all correspondence between the SCA and JGC as well as in internal correspondence between SCA officials, the SCA has done nothing more than reiterate that JGC is under investigation by OTB and DOI for alleged irregularities in connection with an OTB contract and that, pursuant to SCA regulations, JGC will be suspended from working with the SCA pending resolution of the OTB/DOI investigation. *See* Exs. 10, 11, 14, 16 to Gil Aff. Thus, even if the SCA transmits information to VENDEX, the information will be comprised of undis-

---

16. I say "presumably" because plaintiff sets forth only the barest outline of its liberty interest claim. *See* Pl. Mem. at 13; Pl. Reply Mem. at 14.

17. As discussed *supra* Part III.A., JGC claims only that JGC itself will have to report its suspension to VENDEX as part of the required application and bidding process for other city contracts.

puted facts, namely that JGC is being investigated by OTB and DOI and that the SCA suspended JGC. There is absolutely no indication that the information transmitted to VENDEX will be "false."

The decision in *S & D Maintenance* compels this result. In *S & D Maintenance,* the City of New York suspended payment upon, and ultimately terminated, a meter servicing contract with plaintiff S & D pending resolution of a criminal investigation into the circumstances under which S & D had been awarded a prior city contract. *See* 844 F.2d 962. In its suit, S & D alleged, among other things, that public statements, made by city officials in connection with the termination of S & D had " 'impaired S & D's good name, reputation, honor and integrity,' [and] prevent[ed] the company from securing other employment." *Id.* at 970. S & D cited two statements by city officials that had been published in the *Daily News* and *New York Newsday. See id.* The city comptroller was quoted as follows: " 'It is the mayor's policy that companies about which questions have been raised should not get city contracts.' " *Id.* The assistant city comptroller was quoted as follows: " 'We knew exactly what we were doing [by terminating the 1986 S & D contract] ... [W]e would not want to do business with a firm that may possibly be in serious legal or law enforcement difficulties.' " *Id.* (alterations in original). The Court of Appeals concluded that S & D could not assert a protected liberty interest because it had failed to make the required showing that the city officials' published statements were "false":

> In the present case, no [ ] claim of falsity can be made because the City officials quoted in the articles merely state the

undisputed fact that S & D is under investigation for fraudulent procurement of the 1984 contract. The officials are careful not to offer their opinions as to the guilt or innocence of S & D. Whatever stigma attaches to S & D as a result of these articles is the result of the investigation itself, a matter of public record, and not any false statements of the City officials.

*Id.* at 971.

Like the statements of the city officials in *S & D Maintenance,* any statement made by the SCA regarding the fact that it suspended JGC pending the outcome of a criminal investigation is nothing more than a statement of undisputed fact. Any harm to JGC's reputation is a result of the suspension and/or investigation; it does not stem from false publicized statements made by the SCA. As a result, I find, for purposes of this motion, that the SCA did not deprive JGC of any protected liberty interest when it suspended the company.

#### c. Due Process

 Assuming, arguendo, that JGC could demonstrate a protected property and/or liberty interest, and that the SCA has deprived it of that interest, it is more than likely that JGC was afforded all the process it was due. The Due Process Clause does not demand that the government provide a full evidentiary hearing each time it infringes upon a party's property or liberty interest. *See Mathews v. Eldridge,* 424 U.S. 319, 333–335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("Due process is flexible and calls for such procedural protections as the particular situation demands.").[18] Rather, due process requires that the government provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of

---

**18.** The *Mathews* Court set forth the following three-factor balancing test to determine how much process is due in a particular situation: First, [courts should consider] the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if

any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 334–35, 96 S.Ct. 893.

the pendency of the action and afford them an opportunity to present their objections." *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Moreover, under circumstances similar to the instant case, New York state courts have consistently held that a "formal trialtype hearing is not necessary." *Schiavone Contr. Co. v. Larocca,* 117 A.D.2d 440, 503 N.Y.S.2d 196, 198 (3d Dep't 1986) (finding adequate due process where contractor was given notice and opportunity to rebut charges in writing and at informal hearing before city found contractor nonresponsible and rejected bid); *see also Tully Constr. Co. v. Hevesi,* 214 A.D.2d 465, 625 N.Y.S.2d 531 (1st Dep't 1995) (finding that city's termination of contract with plaintiff contractor based on finding of nonresponsibility did not violate due process, even in the absence of an evidentiary hearing, because plaintiff had opportunity to submit written objections).

■ In the instant case, plaintiff received both notice and an opportunity to present objections; it received all of the pre-deprivation process provided for in the SCA Guidelines. *See supra* Part I.A. In fact, the SCA granted plaintiff additional time to gather and present mitigating evidence. *See* 3/29/99 Letter from SCA to Litwack, Ex. 11 to Gil Aff. In total, JGC had more than four months between the time it first received notice that it was at risk of losing its prequalified status (February 22, 1999) and the time its prequalified status was actually suspended (June 1, 1999) to present mitigating evidence to the SCA. During that time, the company did nothing more than claim that the OTB/DOI investigation was a mistake, and that OTB and DOI officials had failed to provide JGC with information regarding the allegations against it.[19] Also during that time, plaintiff failed to pursue available state remedies such as an Article 78 proceeding against DOI or OTB for their alleged refusal to present JGC with the charges against it. It appears at this preliminary stage that JGC was provided with pre-deprivation opportunities to be heard, but that the agency failed to take advantage of those opportunities.

In addition, JGC had a viable post-deprivation remedy for its suspension by the SCA in the form of an Article 78 proceeding in state court. Several courts have held that post-deprivation Article 78 proceedings can provide adequate due process. *See, e.g., Campo v. New York City Employees' Retirement Sys.,* 843 F.2d 96, 101–03 (2d Cir.1988); *Tully Constr.,* 625 N.Y.S.2d at 533. However, JGC never sought an Article 78 review of the SCA's decision to suspend the company from working on SCA projects.[20]

**19.** It is true that in his letter of March 30, JGC's counsel Mr. Litwack requested that the SCA hold a "Name Clearing hearing" and that the SCA apparently declined to hold such a hearing. However, JGC's request came several weeks after the March 5 hearing during which JGC was supposed to present evidence to SCA officials pursuant to the Guidelines. Moreover, in requesting the Name Clearing hearing, JGC's counsel stated that "[a]t that time I will present evidence in the form of tape-recorded conversations with OTB personnel that will establish that my client followed the billing procedures that were dictated to it by OTB." *See* 3/30/99 Letter from Litwack to SCA, Ex. 12 to Gil Aff. I see no reason why JGC could not have presented these tape recordings at the March 5 meeting, and I see no reason why JGC did not submit the tape recordings to the SCA along with its March 30 letter. Finally, Litwack's statement tends to undermine JGC's repeated assertion that it has no knowledge of the allegations against it.

**20.** As discussed above, *see supra* note 13, because the instant case does not involve a random and arbitrary act the availability of an Article 78 proceeding does not necessarily satisfy due process concerns such that plaintiff's § 1983 claim is precluded by plaintiff's failure to exhaust state remedies. This does not mean, however, that upon consideration of the merits of plaintiff's due process claim this Court cannot find that the availability of an Article 78 proceeding does, in fact, satisfy due process. Indeed, at this preliminary stage, it seems likely that the availability of an Article 78 proceeding—together with pre-deprivation notice and an opportunity to object—provided any and all possible due process plaintiff was entitled to receive.

### 2. Substantive Due Process

JGC also claims that the SCA's actions violated its substantive due process rights. *See* Pl. Mem. at 15–16. However, plaintiff fails to set forth any allegations that would support such a claim. *See id.*

 Substantive due process protects those rights that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Local 342 v. Town Bd. of Huntington,* 31 F.3d 1191, 1196 (2d Cir.1994) (internal quotations omitted). "Traditionally, the types of interests recognized under substantive due process include rights of privacy, family and procreation—those rights that are so central to an individual's freedom that 'neither liberty nor justice would exist if [they] were sacrificed.'" *Empire Transit,* 37 F.Supp.2d at 339 (quoting *Bowers v. Hardwick,* 478 U.S. 186, 191–92, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (alteration in original)). Courts are cautioned to "exercise the 'upmost care' when presented with a request to define or develop rights in this area." *Local 342,* 31 F.3d at 1196 (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)).

 Although there is no doubt that plaintiff's concerns regarding its ability to contract with city, state and federal agencies together with its interest in protecting its good name and reputation are important and nontrivial, those concerns "simply are not sufficiently weighty to warrant their protection under the substantive due process rubric." *Empire Transit,* 37 F.Supp.2d at 340 (finding that city's de facto debarment of concrete supplier from working on city contracts did not violate substantive due process). Put another way, plaintiff cannot show that the SCA's actions are so " 'conscience-shocking [ ] or oppressive in a constitutional sense' " that they threaten fundamental notions of liberty and justice. *See Catanzaro v. Weiden,* 188 F.3d 56, 64 (2d Cir.1999) (quoting *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir.1995)). I therefore find that plaintiff has failed to demonstrate any likelihood that it can succeed on the merits of its substantive due process claim.[21]

### 3. Equal Protection

 The Equal Protection Clause of the Fourteenth Amendment demands that "all persons similarly situated [ ] be treated alike." *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995). JGC's equal protection claim is one of "selective enforcement." That is, JGC contends that the SCA has enforced its suspension provisions against JGC while failing to enforce those provisions against other contractors who JGC alleges should also have been suspended. *See* Pl. Mem. at 19–22.

 To maintain a "selective enforcement" equal protection claim, the plaintiff must show that

> (1) the [plaintiff], compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992). In the instant case, JGC claims that other city contractors that

---

**21.** Plaintiff also claims that its substantive due process rights were violated because "the decision to suspend plaintiff due to the pending investigation is without any rational basis." Pl. Mem. at 16. However, as set forth above, SCA officials are specifically authorized to suspend contractors who are the subject of pending criminal investigations. *See* 21 NYCRR § 9600.3(d)(2). Moreover, New York courts have held that an agency "may, on the basis of the prior criminal record of some of its principals, rationally reject [a] bidder." *DeFoe Corp. v. New York City Dep't of Transp.,* 87 N.Y.2d 754, 763, 642 N.Y.S.2d 588, 665 N.E.2d 158 (1996). Accordingly, the SCA's decision to suspend plaintiff is "rational" enough to satisfy substantive due process.

should have been suspended from the SCA's list of prequalified bidders for unsatisfactory performance were not, in fact, suspended and continue to work on and receive contracts from the SCA. *See* Pl. Mem. at 19–20; Gil Aff. ¶¶ 75–106 and Exs. 18–24. JGC provides numerous examples and supporting documents which all tend to show that the SCA did not suspend certain contractors after those contractors were cited for marginal or unsatisfactory work performance. The problem is that none of these contractors is "similarly situated" with JGC. JGC does not allege—as it must—that the SCA learned that these contractors were the subjects of pending criminal investigations and failed to suspend their prequalified bidder status. That the SCA is improperly enforcing its rules with respect to suspension of contractors who perform unsatisfactorily is irrelevant to the instant case. To prevail on an equal protection claim, JGC must show that the SCA suspended JGC's prequalified bidder status because of the OTB/DOI investigation while allowing other contractors that are the subjects of criminal investigations to continue working for the SCA.

 With respect to discriminatory intent, JGC asserts only that none of the contractors who were allowed to continue working despite poor performance "is a minority of Spanish race or national origin, as the plaintiff's principle[sic] is." *See* Pl. Mem. at 20. This vague and bare allegation falls far short of sustaining a claim of discriminatory intent on the part of the SCA. *See, e.g., Catanzaro,* 188 F.3d at 65.

Because plaintiff fails to allege that the SCA treated similarly situated contractors differently than JGC, and because JGC has failed to support its claim that the SCA intended to discriminate against JGC because of its race, I conclude that plaintiff has not proven a likelihood of success on the merits of its equal protection claim.

#### 4. Balance of the Equities

 The public interests at stake in compelling the SCA to revoke its suspen-

sion of JGC and its award of the two contracts are substantial. As set forth *supra* Part I.A., the SCA was created to remedy the deplorable condition of New York city schools, and it was given wide latitude to accomplish this important task. Not only would JGC's requested relief disrupt work that has already started on the two contracts at issue, but it would force the SCA to accept bids from and give work to a potentially unqualified contractor. JGC's interests are serious and nontrivial. However, when considered together with the public interest in providing safe and adequate schools for New York city children, I cannot conclude that the balance tips in plaintiff's favor.

### IV. Conclusion

For the foregoing reasons, plaintiff's motion for preliminary injunctive relief is denied. A status conference is scheduled for October 6, 1999 at 4:30 p.m.